## GEORGE SHELDON
### *v.*
## GEORGE F. HARDING *et al.*

1. QUITCLAIM DEED — *failure of consideration.* A quitclaim deed for land, without reference to the character of title, is, in the absence of fraud, a sufficient consideration to support a contract. Money paid for such a conveyance cannot be recovered back, or a plea of failure of consideration maintained to a note given for such a conveyance, unless fraud has been practiced on the grantee.

2. TRUST — *resulting or implied.* A resulting or implied trust is usually created by the purchase of land with the money of one person in the name of another without the consent of the owner of the means. Such trust is never created by agreement, but always by implication of law, from acts independent of the agreement of the parties.

3. PRACTICE — *dismissing bill.* Where a bill in chancery is not framed on a basis such as will entitle the complainant to the relief he seeks, but it is obvious to the court that he has equities which under a proper bill he could enforce, the true practice is to dismiss his bill without prejudice.

APPEAL from the Warren county Circuit Court.

The case is sufficiently stated in the opinion of the court.

Mr. A. G. KIRKPATRICK, for the appellant.

Mr. A. W. ARRINGTON, for the appellees.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

This was a suit in equity brought by George Sheldon, in the Warren Circuit Court, against George F. Harding and Chauncey Hardin, to enforce an alleged trust and for the payment of money alleged to have been fraudulently obtained. It appears that Chauncey Hardin had a tax title on the land in dispute, and had sold the same to one Rockwell, who, through Bogguss, sold the same to complainant. Rockwell had agreed to pay $1,600 for the quarter, and he sold to complainant for $1,100. Hardin made to the latter a quitclaim deed for the land. It was afterward found that the land had been erroneously assessed for taxation, as the general government had never sold it. The bill alleges that Hardin represented the title to be good when he sold to complainant, when he knew that it belonged to the government; that he acted deceitfully and fraudulently in making the representations.

That after making the purchase, complainant fenced, broke and cultivated the land, since 1857, and in 1862, built a house on it, and moved into and occupied it; that he paid the taxes of 1854 and subsequent years; that George F. Harding, who was a cousin of Chauncey Hardin, and was colluding and confederating with Chauncey, employed Irwin McCartney and others to go on the land in the night-time, and within the inclosure, and whilst complainant was in possession, and erected a small house, to enable George F. to obtain the title by a preemption; that McCartney prepared and filed in the land office affidavits, and attempted to pre-empt the land by reason of having built the house; that he only remained on the land one or two days and left; that complainant had no suspicion that McCartney went upon the land for such purpose.

That about the 16th of October, 1860, complainant learned that the land was subject to entry, and soon after went to Springfield for the purpose of purchasing it of the government. On the 20th of that month he called on the register of the land office, and made application to enter the land, who

informed him that Harding and McCartney were attempting to enter it, and advised him to employ one Leonard as an attorney to assist him; that Harding, claiming the right to pre-empt the land, offered to compromise and take $1,600, and would become the purchaser, and upon that amount being paid to him, would convey to complainant; that on being informed of the proposition by Leonard, he declined it, but instructed Leonard to purchase of Harding on the best terms he could; that on the next day, which was Sunday, Harding and Leonard entered into an agreement that Harding should purchase of the government and sell to complainant, on his paying $1,600 in specified installments, and of the first he was to furnish a land warrant with which to make the entry; and on receiving payment Harding was to convey to complainant; that Leonard signed and sealed the agreement on the part of complainant without authority, but supposing he would be bound by it, when informed of its contents, complainant said he supposed he would have to stand it.

That on the next day, McCartney's application for a pre-emption was withdrawn, and complainant furnished a land warrant for one hundred and sixty acres of land, and four dollars to pay the charges for its location, and the entry was made in the name of Harding. That the land, without improvements, was not worth more than $800; that Harding knew that the representations which he made in reference to the pre-emption were untrue and were made for the purpose of deceiving complainant; that the land has been patented to Harding, and that he should be declared and treated as a trustee of complainant, so far as relates to the title to the land. There was a prayer that Chauncey Hardin be decreed to pay the money received from complainant, and that George F. Harding be decreed to convey the land to him. On a hearing, the court below dismissed the bill, and the case is brought to this court for the purpose of reversing the decree.

So far as this record discloses, Chauncey Hardin did not misrepresent his title knowingly. He had a tax title on the land. It had been returned from the general land office as

having been patented many years previously. It had been listed for taxation, and sold for the non-payment of taxes, and a deed had been made. It was regarded as patented land by the officers of both the State and general governments. And there is no evidence that he knew that the government had not sold it when he contracted it to Rockwell, or when Rockwell gave up his bond and the land was conveyed to appellant. Unless it can be shown, that he knew there had been no transfer of the title by the government, he may have supposed that his tax title was good, and he may have acted in good faith in so recommending it. Nor does it appear very distinctly, from the evidence, that Hardin represented to appellant that his title was good, before it was sold to him.

There can be no doubt that a quitclaim deed for land, without reference to the character of the title, is, in the absence of fraud, a sufficient consideration to support a contract; money paid for such a conveyance cannot be recovered back, or a plea of failure of consideration maintained to a note given for such a conveyance. Such deeds are made because the vendor is unwilling to warrant the title; and they are accepted because the grantee is willing to take the hazard of the title and believes it is worth the price he pays, or agrees to pay. And, unless fraud is practiced upon the grantee, the law permits such contracts to be made, and will uphold and enforce them. In this case, appellant has failed to establish fraud in the sale from Chauncey Hardin to him, and the bill was properly dismissed as to him.

On the other branch of the case, it may be truly said, that the land was in the market, and both parties, in law, had the right to enter into competition for its purchase. It is true, that, until McCartney's application for a pre-emption was disposed of, the land would not have been offered for sale. The register had intimated, and we think correctly, that his application could not be allowed. But as soon as it should have been rejected the land would, under the regulations of the department, have been put up at auction and sold to the highest bidder. But, upon the application for a pre-emption

being rejected, McCartney could have prosecuted an appeal from the decision to the department, which would have involved delay and expense to have it determined. Knowing this, appellant would naturally desire to have the matter adjusted. And, as a general rule, the compromise of any claim that is not immoral will support an agreement for a compromise.

It is urged that the arrangement entered into by the parties was a combination entered into to prevent bidding and to depress the price of land at the sale. If this was so it was a question which affected the government alone, and of which the parties to the agreement cannot object. And when the general government granted the patent for the land, and delivered it to Harding, it waived all objections to the mode in which the entry was made. If appellant were to successfully urge that the sale was illegally made, that would place him in no better condition, as by such a result the title would be again vested in the government. But Harding having purchased the land, and the patent having been issued to him, he thereby became vested with the legal title, which, so far as this record discloses, he still holds.

Was appellee a trustee for appellant? The latter furnished the means with which it was entered, the former having in fact paid nothing toward its entry. But by the arrangement he was to obtain a large sum of money for conveying to appellant the land which was purchased in appellee's name, and which appellant had previously attempted to purchase, and paid out perhaps the value of the land. There can be but little doubt that appellant was induced to give appellee the sum agreed to be paid, to save, as far as he could, some portion of the value he had imparted to the land by his labor and money. And, however strongly these facts may appeal for relief, they do not create appellee a trustee for appellant. If this was a trust it was such a trust only as was declared by the contract, and must, if at all, be executed according to the terms of the agreement entered into by the parties.

We are unable to declare this contract void, and decree the land in equity to belong to appellant. If the agreement was

annulled, it would leave the land in appellee, and nothing more than a verbal agreement for the conveyance of the land, and such an agreement would be incapable of enforcement, under the statute of frauds. In such a case it would be but a parol trust, which is prohibited by the fourth section of the act which requires all express trusts to be reduced to writing and signed by the party creating the trust.

If, however, the agreement should be set aside, as manifested by the written agreement, and the verbal agreement was held to be void, we are at a loss to perceive in what manner appellant became entitled to the land. It seems to have been entered in Harding's name by the express agreement of all parties. Appellant even did not expect that it would be entered in the name of any other person. This being so, a resulting trust was not created simply by the fact that appellant furnished the warrant with which to make the entry. A resulting or implied trust is usually created by the purchase of land with the money of one person in the name of another, without the consent of the owner of the means. In such a case, he may pursue the land for which his money was paid, and treat the holder of the legal title, with notice, as a trustee, and compel a conveyance; such a trust not being within the statute of frauds, it will be enforced in equity. A resulting trust is never created by agreement, but always by implication of law, from such acts independent of agreement by the parties. But a trust created by verbal agreement, being like any other verbal sale of lands, is prohibited by the statute of frauds, and will not be enforced in equity.

The only remedy, then, left to appellant, is by a performance of his part of the written contract, which if not made under his express authority, was ratified and confirmed by him after its execution. And inasmuch as the general government has raised no objections to its validity, the parties are bound for its performance. Appellant having purchased and paid for the tax title, and having made valuable improvements upon the land, under the belief that he was the owner, and having advanced the funds to make the entry, his equities are clear,

and entitle him to relief, upon his paying the balance of the money specified in the agreement. We are at a loss to see how a case presenting stronger equities could well occur, if appellant should pay the balance of the money specified in the agreement. This being so, the court below should have dismissed the bill without prejudice, so as to have enabled appellant to file a new bill if he chose, for the purpose of obtaining a conveyance under the written agreement.

The evidence fails to establish that degree of mental weakness or infirmity which the law requires to avoid an agreement. It is, no doubt, true, that he had been in poor health, and was perhaps still physically debilitated, but we discover no evidence of mental derangement or imbecility, or even weakness of mind, such as would authorize a court to say that he was incapable of comprehending the nature and effect of his acts, or that implies that he could not comprehend the operation and effect of this contract which he entered into to effect a compromise, and to save, as far as he could, a portion of his hard earned property. He is not entitled to have the agreement set aside because he was incapable of entering into the contract.

The decree of the court below is modified, so that the bill will stand dismissed without prejudice.

*Decree modified.*